## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALONZO D. JONES, SR.,          : Civil No. 1:23-CV-1694
:
       Plaintiff,             :
:
    v.                        :
                            : (Chief Magistrate Judge Bloom)
MARTIN O'MALLEY,         :
Commissioner of Social Security,[1]   :
:
       Defendant.           :

## MEMORANDUM OPINION

## I.   Introduction

On November 17, 2016, Alonzo D. Jones, Sr. ("Jones"), filed an application for supplemental security income under Title XI of the Social Security Act. (Tr. 20). A hearing was held before an Administrative Law Judge ("ALJ"), who found that Jones was not disabled from his alleged onset date, October 31, 1985, to October 23, 2018, the date the ALJ issued his decision. (Tr. 28). Jones appealed that decision, and the court remanded the case for further consideration. *Jones v. Saul*, No. 1:19-CV-

---

[1] Martin O'Malley became the Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted as the defendant in this case. Pursuant to 42 U.S.C. § 405(g), no further action is required to continue this suit.

1940, 2021 WL 1172992 (M.D. Pa. Mar. 29, 2021).  Specifically, the court found that the ALJ had not properly considered the medical opinion evidence, and further, that the opinion failed to "address in a meaningful way the impact of what are described as multiple seizures Jones experiences on a monthly basis on his ability to work." *Id.* at *11.

On March 28, 2023, a second hearing was held before the same ALJ, who again found that Jones was not disabled from the alleged onset date to June 14, 2023, the date the second decision was issued.  (Tr. 521). Jones now appeals this decision, arguing that the decision is not supported by substantial evidence. After a review of the record, we conclude that the ALJ's decision is not supported by substantial evidence. Therefore, we will remand this matter for further consideration by the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

On November 17, 2016, Jones applied for supplemental security income, alleging disability due to epilepsy, migraines, hypertension, and diminished vision in his left eye, which began on October 31, 1985.  (Tr. 20-22).  According to Jones' medical records, his alleged disabilities arose

from a series of injuries he sustained during his childhood and early adulthood. (Tr. 26). On October 31, 1985, when Jones was eight years old, he was struck by a car, causing a traumatic brain injury which, in turn, resulted in a seizure disorder. (Tr. 422). Two years later, Jones hit his head after falling out of a tree, requiring a metal plate to be permanently implanted into his skull. (*Id.*). Finally, when Jones was 22 years old, he suffered a gunshot wound to the left side of his face, causing permanent disfigurement and blindness in his left eye. (Tr. 265, 422, 424).

On August 8, 2016, Jones was transported to York Hospital by emergency medical services ("EMS") after suffering a tonic-clonic seizure, formerly known as a grand mal seizure. (Tr. 255). At that time, Jones had been prescribed phenobarbital and lamotrigine for his seizures. (*Id.*). At the hospital, he informed his treating physicians that he had not missed any doses of phenobarbital but that he only took his lamotrigine "'when [he] need[ed] something extra.'" (*Id.*). Moreover, Jones' treatment notes from that visit indicate that Jones had "issues with compliance in [the] past." (*Id.*).

3

Between October of 2016 and April of 2017, Jones received treatment from his primary care provider—Dr. Walter Krajewski, D.O.—and his neurologist—Dr. Fengjun Jiang, M.D.  (Tr. 434-37, 497-98). Jones told Dr. Krajewski in October of 2016 that he had been having seizures and told Dr. Jiang in February of 2017 that his seizures were worsening.  (Tr. 434, 498).  However, in April of 2017, Jones reported to Dr. Krajewski that he had been feeling sick and nauseous but had not experienced any other symptoms.  (Tr. 497).

On May 8, 2017, Dr. Spencer Long, M.D., performed an internal medicine examination on Jones.  (Tr. 422-25).  During the examination, Jones reported that he experienced seizures approximately three times per week and suffered from migraine headaches once per month.  (*Id.*). Dr. Long's notes state that Jones could conduct "self-care," cook, clean, read, and socialize.  (Tr. 423).  Dr. Long also noted that Jones was totally blind in his left eye, his left eye did not respond to light, and his visual fields to confrontation were absent on the left.  (Tr. 424).

Based on Jones' statements and a review of Jones' medical records, Dr. Long opined that Jones was subject to numerous physical and

4

environmental limitations.  (Tr. 426-47).  For example, he opined that Jones could only sit or stand for 30 minutes at a time and could never work around unprotected heights or moving mechanical parts.  (Tr. 427, 430).  However, Dr. Long opined that Jones could see well enough to avoid ordinary workplace hazards, read very small print, view a computer screen, and discern differences in the shape and color of small objects, such as screws, nuts, or bolts.  (Tr. 429).  Therefore, Dr. Long did not assess any limitations based on Jones' partial blindness.  (*Id.*).

On May 26, 2017, Jones was transported to York Hospital after having a seizure.  (Tr. 457).  At the hospital, Jones stated that he had a headache and was having approximately four seizures per week.  (*Id.*).  Though Jones stated that he was compliant with both of his seizure medications, blood tests revealed that he was noncompliant with lamotrigine and that his phenobarbital level was low.  (*Id.*).

On June 5, 2017, Jones followed up with Dr. Jiang, who noted that Jones was blind in his left eye and that his headaches and seizures were severe and worsening.  (Tr. 440-42).  Later that month, Jones underwent an "awake and asleep" electroencephalogram ("EEG") and an ambulatory

EEG with Dr. Jiang, both of which returned normal results. (Tr. 444, 463-64). However, Dr. Jiang noted that "[a] normal study does not rule out the diagnosis of seizure disorder." (Tr. 463).

In September of 2017 and January of 2018, Jones was hospitalized after experiencing additional seizures. (Tr. 465). Jones' treatment notes from September of 2017 state that he was treated for his post-seizure headache and received a CT scan, which showed no abnormalities. (Tr. 467, 469). His September 2017 notes also state that he had been prescribed lamotrigine and phenobarbital but had not taken his lamotrigine that morning. (Tr. 466). On January 16, 2018, Jones suffered what he describes as a "black[] out" seizure, during which he lost consciousness and began staring straight ahead, but did not convulse. (Tr. 39, 478, 494). During a follow-up appointment with Dr. Krajewski on January 31, 2018, Jones stated that he had been suffering three to four seizures per month. (Tr. 494).

On June 20, 2018, Jones attended a 6-month follow-up appointment with Dr. Krajewski, during which he reported occasional seizures. (Tr. 490). Eight days later, Jones reported to Dr. Jiang that he was

experiencing black out seizures every day.  (Tr. 767-68).  Dr. Jiang scheduled Jones for a video EEG at York Hospital to determine the cause of his seizures.  (Tr. 767).

Between August 6, 2018 and August 10, 2018, Jones underwent continuous EEG monitoring after being weaned from his antiseizure medications.  (Tr. 817).  The results of the EEG were normal, and there were "no neurologic events to explain [Jones'] recurrent blackouts." (*Id.*).  Based on those results, Jones' treating physician noted that it was "unclear at this point whether [Jones] has epilepsy…." (*Id.*).

On August 26, 2018, Jones was transported to York Hospital after having a 15-minute seizure in his bed.  (Tr. 809, 935).  Jones' hospital notes state that he was not on any antiepileptic medications.  (Tr. 809).  When he arrived at the hospital, Jones returned to baseline and received a CT scan, the results of which were normal.  (Tr. 814).

Between February of 2019 and October of 2019, Jones met with Dr. Krajewski three times.  (Tr. 914-16).  Notes from Jones' visit in February of 2019 indicate that he was experiencing headaches but "no seizures." (Tr. 916).  In June of 2019, Jones reported occasional seizures at home.

7

(Tr. 914).    However, in October of 2019, Jones "presented to [Dr. Krajewski's] office [] with paperwork" and stated that his seizures were becoming more frequent.  (Tr. 917).  Dr. Krajewski instructed Jones to follow up with Dr. Beth Jolly, M.D., a neurologist.  (*Id.*).

On December 10, 2019, Jones attended an appointment with Dr. Jolly.  (Tr. 932).  Dr Jolly noted that Jones had "[n]o vision in left eye" and that he was experiencing seizures approximately three times per week.  (*Id.*).  She also noted that Jones' seizures were poorly controlled and that "information from [Dr. Krajewski's] office indicates a history of poor medication compliance."  (Tr. 933).

In April and July of 2021, Jones attended follow-up appointments with Dr. Krajewski.  (Tr. 911, 919).  In April of 2021, Dr. Krajewski noted that Jones felt as though he would pass out from lightheadedness every morning and that he had several seizures since his last visit, over one year prior, in March of 2020.  (Tr. 919).  However, his notes also indicate that Jones had not been taking his antiseizure medication.  (Tr. 919).  In July of 2021, Dr. Krajweski noted that Jones had experienced "no seizures" but was still feeling "woozie" in the morning.  (Tr. 911).

In June of 2022, EMS responded to a 911 call reporting that Jones was having a seizure. (Tr. 1043). When EMS arrived, Jones was alert and oriented, sitting on a chair in his living room. (*Id.*). Jones was transported to York Hospital, where he received a CT scan, which returned normal results. (Tr. 994-95). Though Jones told hospital staff that he had consistently been taking his blood pressure and antiseizure medication, notes from EMS state that Jones was "not medicated." (Tr. 988, 1043).

Between June and November of 2022, Jones reported to Dr. Krajewski that he was experiencing a range of seizure symptoms. (Tr. 1186-89). During one visit, Jones stated that he had "'[b]lacked out like [a] zombie" for 15 minutes the prior week while fishing. (Tr. 1186). In October of 2022, Jones reported that he had suffered a headache and dizziness in the morning but was "fine" by the time of his appointment. (Tr. 1188). Treatment notes from November of 2022 state that Jones was taking all medications as directed and that he had experienced one minor seizure since his prior visit. (Tr. 1189).

9

On March 13, 2023, Jones was transported by EMS to the York Hospital emergency department after experiencing another seizure. (Tr. 1190). At the hospital, Jones stated that he had forgotten to take his seizure medication that morning. (*Id.*). Jones' treating physician discharged him in stable condition and advised him to follow up with his primary care physician. (Tr. 1191). One week later, during a follow-up appointment, Dr. Krajewski noted that Jones was experiencing approximately three seizures per month despite taking all his medications as directed. (Tr. 1185). Dr. Krajewski referred Jones back to WellSpan neurology. (*Id.*).

It was against the backdrop of this evidence that the ALJ conducted a hearing on March 28, 2023, during which only Jones testified. (Tr. 529-56). Following the hearing, on June 9, 2023, the ALJ issued a decision denying Jones' application for benefits. (Tr. 510-21). At Step 1 of the of the sequential analysis that governs Social Security cases, the ALJ concluded that Jones did not engage in substantial gainful activity between November 17, 2016—the application date—and the date the decision was issued. (Tr. 513). At Step 2, the ALJ found that Jones

10

suffered from four severe impairments: epilepsy, migraines, hypertension, and diminished vision in the left eye. (*Id.*). The ALJ also found that Jones had been treated for lumbar back pain. (*Id.*). However, he concluded that that condition was non-severe because it did not cause more than mild limitations. (*Id.*). At Step 3, the ALJ concluded that none of Jones' severe impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 513-14).

Between Steps 3 and 4, the ALJ concluded that Jones:

[H]a[d] the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) and he can occasionally balance and climb ramps and stairs; and never climb ladders, ropes, or scaffolds. He can occasionally perform near acuity, far acuity, and field of vision on his left; and occasionally perform depth perception bilaterally. He cannot be exposed to extreme cold, extreme heat, wetness, humidity, vibration, fumes, dusts, gases, odors, poor ventilation, unprotected heights, moving machine parts, or SCO noise level no greater than three.

(Tr. 514).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Jones' reported symptoms. (Tr. 366-82). First, he first considered the opinions of Drs. Toni Jo Parmelee, D.O. and Joanna DeLeo, D.O., both of

11

whom were non-treating, non-examining state agency medical consultants. (Tr. 517). Both doctors opined that Jones was blind in his left eye and had limited near and far acuity and a limited field of vision on his left side. (Tr. 95-97, 625, 627-28). While Dr. Parmelee opined that Jones had limited depth perception in both eyes, Dr. DeLeo opined that Jones only had limited depth perception in his left eye. (Tr. 95, 628). Dr. DeLeo opined that Jones had the capacity to perform heavy or very heavy work and Dr. Parmelee opined that Jones could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, and stand, walk and sit for six hours in an eight-hour day. (Tr. 94, 629). Both doctors also opined that Jones was subject to a range of environmental limitations. (Tr. 94-95, 628).

The ALJ gave partial weight to these medical opinions. (Tr. 517). He reasoned that both doctors understated the lack of recent treatment for Jones' vision and found, contrary to both opinions, that Jones could "occasionally perform near acuity, far acuity, and field of vision on his left; and occasionally perform depth perception bilaterally." (*Id.*). The ALJ found that those limitations were supported by Jones' longitudinal

treatment record, which showed, among other things, that he was alert and oriented, was in no acute distress, and exhibited "intact extraocular movements in the right eye." (*Id.*). The ALJ also reasoned that the above limitations were consistent with Jones' activities of daily living, including his ability to write poetry, cut grass, and shop in stores. (*Id.*).

The ALJ next considered Dr. Long's opinion, which he gave little weight. (Tr. 517-18). He reasoned that Dr. Long's opinion was inconsistent with his examination of Jones, which showed that Jones had a normal gait, normal heart rate, full strength, and no muscle atrophy. (Tr. 518). The ALJ also found that Dr. Long's opinion was inconsistent with the fact that Jones had not sought treatment with a neurologist since 2020. (*Id.*).

The ALJ next considered three opinions rendered by Dr. Krajewski, Jones' treating physician. (Tr. 518-19). In those opinions, Dr. Krajewski stated that Jones was blind in his left eye and suffered from "complex partial seizures evolving to generalized seizures" two to four times per month. (Tr. 489). According to Dr. Krajewski, Jones' seizures were poorly controlled despite multiple interventions by neurology and were

not expected to improve in the future.  (*Id.*).  Based on the severity of Jones' impairments, Dr. Krajewski opined that Jones needed to be placed in a long-term intermediate care facility.  (Tr. 940-41).  He later opined that if Jones had to work full time, his condition would worsen due to additional stress, and he would likely have to miss more than four days of work per month.  (Tr. 1184).

The ALJ gave little weight to Dr. Krajewski's opinions.  (Tr. 518-19).  First, he reasoned that Dr. Krajewski's opinions were inconsistent with his progress notes, which showed that Jones exhibited no focal deficits, had no seizures in February of 2019, and had not been taking his antiseizure medication in April of 2021.  (Tr. 518).  He also found that Dr. Krajewski's opinion was inconsistent with the longitudinal treatment notes, which, among other things, showed that Jones was "fully oriented, alert, and in no acute distress," had normal neurological findings, and exhibited no neurological focal deficits.  (*Id.*).  The ALJ rejected Dr. Krajewski's statement that Jones had been consistently taking his medication because it was inconsistent with Dr. Jolly's statement that "information from [Dr. Krajewski]'s office indicates a history of poor

medication compliance" and the March 2023 emergency room record, which showed that Jones "forgot to take his seizure medication." (Tr. 518-19 (quoting Tr. 933, 1190)). The ALJ further found that Dr. Krajewski's opinion was inconsistent with Jones' activities of daily living and with the fact that Jones had not seen a neurologist since 2020.

Finally, the ALJ considered the opinion of the opinion of Walter Zimmerman, D.C., Jones' chiropractor. (Tr. 519). Dr. Zimmerman stated that he did not treat Jones for seizures and that he was unsure how Jones' seizures would affect his ability to work. (Tr. 1056-60). Therefore, the ALJ accorded minimal weight to Dr. Zimmerman's opinion. (Tr. 519).

The ALJ also considered Jones' symptoms, but ultimately found that the statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence. (Tr. 515). In making this determination, the ALJ considered Jones' testimony from the original hearing and the rehearing, as well as the statements in an adult function report that Jones submitted between the first and second hearings. (Tr. 515-17).

Jones testified at the July 23, 2018, hearing that he was experiencing approximately three seizures per month, which were triggered by high blood pressure. (Tr. 55, 59-60). He explained that he suffered from two kinds of seizures—"black[] out" seizures, which are less severe, and grand mal seizures, which are more severe. (Tr. 60). Jones testified that he had several "black out" seizures and one grand mal seizure per month. (*Id*). Jones recounted that on one occasion, he fell down a flight of stairs after having a blackout seizure at the top of the stairwell. (Tr. 47-48). Jones also testified that he experienced severe migraine headaches that usually lasted several hours but sometimes lasted an entire day. (Tr. 43, 49). Regarding his activities of daily living, Jones testified that he lived with his mother and sister and that he performed small chores around the house, such as cutting the grass and sweeping the floor. (Tr. 57-59). Jones also testified that he fished with his cousin for fun. (Tr. 54). However, Jones stated that he did not do laundry and that his mother would not allow him to cook because of his seizures. (Tr. 58-59). He also explained that he did not have a driver's

license because his doctor had advised him it was too dangerous for him to drive. (Tr. 53).

On January 31, 2020, Jones completed an adult function report. (Tr. 726). In the report, Jones stated that he could shop with his girlfriend, handle a savings account, count change, and use a checkbook. (Tr. 728). He also wrote that his hobbies included watching movies, writing poetry, and fishing with his friend. (Tr. 731). However, he stated that he could not perform any house or yardwork, such as cleaning, laundry, or mowing the grass. (Tr. 729). He also stated that he could not drive a car due to his seizure disorder. (Tr. 728).

During the second administrative hearing on March 28, 2023, Jones testified that despite taking his medications as prescribed, he was having one or two black out seizures per week and one or two grand mal seizures per month. (Tr. 543, 549-50). Jones testified that on the day after a grand mal seizure, he typically feels "just tired...a little wore [sic] out." (Tr. 552). In addition to seizures, Jones testified that he experienced migraine headaches once or twice per year. (Tr. 550).

The ALJ found Jones' statements to be inconsistent with the objective clinical findings. (Tr. 515). He reasoned that during the relevant period, Jones exhibited normal sensation, strength, coordination, heart rate, heart rhythm, gait, tendon reflexes, and finger dexterity. (*Id.*). The ALJ also noted that Jones was generally alert and oriented during his medical examinations, that his neurological examinations were normal, that his cranial nerves were intact, and he did not display any focal neurological deficits. (*Id.*). He then reasoned that Jones' testimony was inconsistent with his activities of daily living, which show that Jones can "finish[] what he starts," write poetry, shop in stores, cut grass, count change, handle a savings account, use a checkbook, engage in "self-care," read, socialize, and go fishing. (Tr. 516).

Having made these findings, the ALJ found that Step 4 of the sequential analysis was inapplicable because Jones had no past relevant work experience. (Tr. 519). At Step 5, the ALJ found that Jones could perform jobs in the national economy, such as dining room attendant, egg packer, and bakery racker. (Tr. 520). Accordingly, the ALJ found that

Jones had not met the stringent standard prescribed for disability benefits and denied his claim. (Tr. 521).

This appeal followed. On appeal, Jones argues that the ALJ erred in his consideration of the opinion evidence and failed to include adequate visual limitations in the RFC. After consideration, we conclude that the ALJ's opinion is not supported by substantial evidence. Accordingly, we will remand this matter to the Commissioner for further consideration.

## III.  Discussion

### A. Substantial Evidence Review – the Role of This Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations."  *Id.* Thus, the question before us is not whether Jones is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law.  *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir.

2005)).   Thus, we cannot reweigh the evidence.   Instead, we must determine whether there is substantial evidence to support the ALJ's findings.  In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).  This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements.  *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted).  Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether Jones: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her

age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine Jones' residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all Jones' medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of the analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

Jones bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that Jones can perform consistent with

24

Jones' RFC, age, education, and work experience.    20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination.   While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.*, 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006).   Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision.   Cases that emphasize the importance of medical opinion support for an RFC assessment typically

arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79.  These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination.  On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence.  *See Titterington*, 174 F. App'x 6; *Cummings*, 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns*, 312 F.3d 113.

## C. The ALJ's Decision is Not Supported by Substantial Evidence.

As we have noted, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests," *Cotter*, 642 F.2d at 704, and the ALJ must "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his

finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999). After consideration, we conclude that the ALJ's RFC determination is not supported by an adequate explanation.

Jones' disability application was initially remanded by this court to the ALJ based on the ALJ's failure to properly consider the medical opinion evidence, as well as the failure to address the impact of Jones' longstanding seizure disorder on his ability to work. In that decision, Magistrate Judge Carlson found that the ALJ's reliance on Dr. Parmalee's opinion was not supported by substantial evidence because Dr. Parmalee's opinion did not take into account Jones' hospitalizations for seizures that occurred after she rendered her opinion. *Jones*, 2021 WL 1172992, at *11. Further, Judge Carlson found that the ALJ's opinion failed to address how Jones' longstanding seizure disorder impacted his ability to work, specifically noting the ALJ's reliance on Jones' examination findings and activities of daily living. *Id.* at *10.

Our review of the ALJ's second decision indicates that this decision suffers from the same flaw as the previous decision; namely, the ALJ's decision fails to address the impact of Jones' seizure disorder on his

27

ability to work. Much like the initial decision, the ALJ's decision in this matter focuses largely on objective examination findings, such as the fact that Jones was generally alert, fully oriented, and exhibited no focal deficits. (Tr. 515, 518). The ALJ also relies on the fact that Jones was noncompliant with his medication during the relevant period. (*Id.*). However, as Judge Carlson explained in his opinion remanding the initial decision:

> Seizure disorders are profound but episodic. A person who suffers from a severe seizure disorder often functions well until the onset of these seizures when he is unable to function at all. Therefore, focusing (sic) on how Jones functions when he is not experiencing a seizure sheds little light on the degree to which his recurrent seizures would be disabling in the workplace.

*Jones*, 2021 WL 1172992 at *10.

In our view, the ALJ's second decision on Jones' disability application similarly fails to adequately explain or discuss Jones' longstanding seizure disorder and its effect on his ability to work. Instead, the ALJ largely discounts the opinions of Jones' treating provider based on the seemingly normal objective examination findings, reasoning that Dr. Krajewski's notes "largely show the claimant has no

focal deficits, and in February 2019, that the claimant had 'no seizures,' and in April 2021, the claimant 'has not [been] taking meds.'" (Tr. 518) (citations to the record omitted). Such reliance on these findings is precisely what Judge Carlson found to be "an [in]adequate explanation for discounting the two years of treatment notes from these providers, which indicate that the plaintiff has long suffered from multiple seizures per month, as well as severe migraine headaches and high blood pressure, which was noted to be a possible cause of his seizures." *Jones*, 2021 WL 1172992, at *10. Thus, we cannot conclude that the ALJ's determination that Jones could perform a range of medium work is supported by substantial evidence.

Accordingly, a remand is required for further consideration of these issues. While we reach this conclusion, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on the ultimate outcome of this matter. Rather, that task is left to the ALJ on remand.

IV. <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner will be

REMANDED for further consideration.

An appropriate order follows.


<u>*s/ Daryl F. Bloom*</u>
Daryl F. Bloom
Chief United States Magistrate Judge